CARTER ET AL., APPELLEES, *v.* OHIO DEPARTMENT
OF HEALTH ET AL., APPELLANTS.

[Cite as Carter *v.* Ohio Dept. of Health (1986), 28 Ohio St. 3d 463.]

(No. 86-395—Decided December 31, 1986.)

*Dennis R. Morgan,* for appellees.

*Anthony J. Celebrezze, Jr.,* attorney general, *Laurel D. Blum* and *William S. Lavelle,* for appellants.

*Per Curiam.* The primary issue presented in this appeal is whether ODH had authority to abolish appellees' positions and enter into a contract with a private firm to perform the services previously performed by the appellees. We hold in the affirmative and, accordingly, reverse the judgment of the court of appeals.

From the outset of this controversy, ODH has maintained that its decision to abolish a number of positions within the data services unit and to contract out the data entry services was "for reasons of economy." ODH

argues that R.C. 124.321(D) clearly authorizes the abolishment of the positions for such reason. R.C. 124.321 provides in relevant part:

"(D) Employees may be laid off as a result of abolishment of positions. Abolishment means the permanent deletion of a position or positions from the organization or structure of an appointing authority due to lack of a continued need for the position. An appointing authority may abolish positions as a result of a reorganization for the efficient operation of the appointing authority, *for reasons of economy, or for lack of work.* * *" (Emphasis added.)

The court of appeals held that an abolishment did not occur and that "* * * R.C. 124.321(D) does not allow a certified civil service employee to be laid off from a position while leaving that position intact for another person to fill, whether that person is another public employee or an employee of a private concern." We disagree.

R.C. 124.321(D) specifically provides that an appointing authority may abolish positions "for reasons of economy." The data entry positions within ODH were permanently deleted for economic reasons. The record is replete with credible evidence concluding that the abolishments would result in considerable economy to ODH and, consequently, to the taxpayers of this state. The record reveals that savings in the range of $140,000 per full fiscal year can be realized as a result of the "contracting out" of the data entry services.

Despite appellees' assertions to the contrary, this interpretation of the statute is not violative of the basic principles of the civil service system. It is well-established that the purpose of civil service is "* * * to eradicate the spoils system by protecting an employee who has civil service tenure from being arbitrarily discharged and replaced with a political appointee." *State, ex rel. Sigall,* v. *Aetna* (1976), 45 Ohio St. 2d 308, 314 [74 O.O.2d 471]. There is no evidence in the record to substantiate a claim that ODH was attempting to thwart the purposes of the civil service system. The actions of ODH were not designed to replace appellees with political appointees. Any evidence of an attempt to thwart the purposes of the civil service system would cause a different result. However, as the purposes of civil service should not be ignored, neither should substantial savings to the taxpayers of this state. The goal of maintaining the civil service system must be balanced with the goal of a fiscally responsible state government.

Appellees further contend that the decision in *Local 4501* v. *Ohio State Univ.* (1984), 12 Ohio St. 3d 274, dictates a result in their favor. However, *Local 4501* did not involve an abolishment of positions pursuant to R.C. 124.321(D). "* * * The university has not *formally abolished* the vacant positions or filled them with new civil service employees.* * *" (Emphasis added.) *Id.* at 276. Moreover, in *Local 4501* v. *Ohio State Univ.* (1986), 24 Ohio St. 3d 191, this court stated that the holding in the previous *Local 4501*, should be limited to the "rare instance" of the facts of that case. See

*Local 4501, supra* (24 Ohio St. 3d), at 196. Thus, we find that the original *Local 4501* decision is not applicable to the facts of the instant case.

We therefore hold that the actions of ODH in the instant cause were taken in accordance with law. The record reveals that (1) ODH complied with all the procedural requirements imposed by the Ohio Administrative Code and relevant statutes with regard to layoffs; (2) ODH properly arranged through the state Department of Administrative Services to subcontract its data entry work with a private firm; and (3) ODH properly abolished appellees' positions for reasons of economy within the scope of R.C. 124.321(D).[1]

Based on the foregoing, we reverse the judgment of the court of appeals.

*Judgment reversed.*

CELEBREZZE, C.J., LOCHER, HOLMES and WRIGHT, JJ., concur.

SWEENEY, J., dissents.

C. BROWN and DOUGLAS, JJ., separately dissent, with opinions.

DOUGLAS, J., dissenting.[2]   The issue presented in this case is whether, under R.C. 124.321(D), appellants lawfully abolished appellees' civil service positions with the Ohio Department of Health. R.C. 124.321 provides, in pertinent part:

"(D)  Employees may be laid off as a result of abolishment of positions. *Abolishment means the permanent deletion of a position or positions from the organization or structure of an appointing authority due to lack of continued need for the position.* An appointing authority may abolish positions as a result of a reorganization for the efficient operation of the appointing authority, for reasons of economy, or for lack of work. The determination of the need to abolish positions *shall indicate the lack of continued need* for positions within an appointing authority. Appointing authorities shall themselves determine whether any position should be abolished and shall file a statement of rationale and supporting documentation with the direc-

---

[1] While not applicable to the instant action, it should be noted that today's decision does not adversely affect the right of civil servants to protect their positions at the bargaining table under their statutory right to collectively bargain with their employers over "matters pertaining to wages, hours, or terms and other conditions of employment." R.C. 4117.08(A). See, *e.g., Local 4501* v. *Ohio State Univ.* (1986), 24 Ohio St. 3d 191, at 195.

[2] Once again, I am constrained from fully commenting on the animadversions contained in Justice Brown's dissent. What he has said is, once more, less than truthful and, not sadly, by the Grace of God it will soon be over. While his invectives may continue in other forums, his objurgations will no longer worm their way into opinions of this court.

tor of administrative services prior to sending the notice of abolishment. If an abolishment results in a reduction of the work force, the appointing authority shall follow the procedures for laying off employees * * *." (Emphasis added.)

In contrast to the majority's view, I find the operative language of this statute to be: "* * * Abolishment means the permanent deletion of a position or positions * * * *due to lack of continued need for the position.* * * *" (Emphasis added.)

This definition contemplates the permanent elimination of a distinct labor unit or position for the reason that particular services, as performed by an employee or employees within that unit or position, are no longer required. The legislature did not intend that this statute provide for the ouster of civil service employees from their jobs when substantially the same work being performed by these employees was then to be performed by others in a like capacity and no consolidation of the work had taken place.

Limited by these general considerations, an appointing authority may, under appropriate circumstances, abolish positions within the control of the appointing authority. These circumstances, delineated in R.C. 124.321(D), include reorganization for purposes of efficiency, reasons of economy, or lack of work. Thus, if an appointing authority's organization can operate more efficiently or economically by either not performing a given service or by consolidating the services that employees in one position perform with another position in the organization, then the appointing authority may abolish a given position. Conversely, so long as the specific work needs to be performed, and that work is not to be accomplished, through consolidation, by others within the appointing authority, that position cannot, by statutory definition, lawfully be abolished.

In the instant case, appellants concede that the particular services appellees were performing as data entry operators are still to be performed. What has happened, in its simplest terms, is that in fact, the position of data entry operator still exists, except that now, state employees, who believed they were protected by the civil service laws of Ohio, have been replaced by lower paid private employees who are performing the work outside government employment. Such a result was never envisioned within the ambit of R.C. 124.321.

The countenancing of this corrosive practice serves only to undermine the civil service system of this state. As this court has recognized for over sixty years, the purpose of the civil service laws and rules is to establish a merit system whereby appointments in government service are based upon demonstrated relative fitness rather than political considerations. *Curtis* v. *State, ex rel. Morgan* (1923), 108 Ohio St. 292, paragraph four of the syllabus; see, also, *State, ex rel. Sigall,* v. *Aetna* (1976), 45 Ohio St. 2d 308, 314 [74 O.O.2d 471]. If the subverting of this system is to be permitted (the clear result of the majority decision), then the very least that

should be demanded is the requirement that the statute being used to bring about this result should be strictly followed. It is clear why the majority makes no reference to that portion of the statute that precedes the portion upon which they rely. Before one, reading the statute fairly, ever gets to the "economy" language, the language defining "abolishment" must be confronted. The majority somehow waves a magic wand and makes the language "* * * permanent deletion of a position * * * due to lack of continued need for the position" disappear. It is little wonder that there is no case authority cited by the majority for its holding—there is none!

The insidious effect of the results of the majority decision herein were well described in *Local 4501* v. *Ohio State Univ.* (1984), 12 Ohio St. 3d 274, 276, where we said:

"* * * Slowly and inevitably, the civil service system is eroded and, ultimately, eradicated entirely. The result is that * * * [an appointing authority] obtains a free hand to let out all services on a contract by contract basis without any moderation or restriction by the civil service system. Political activity is no longer restrained and the laudable purpose of the civil service system is sidestepped completely."

These considerations were again emphasized in *Local 4501* v. *Ohio State Univ.* (1986), 24 Ohio St. 3d 191.[3] There we noted that "* * * *absent a check* on public employers who are desirous of substituting independent contractors for civil servants, the need to protect the civil service outweighs any potential benefits that might accrue to a governmental entity as a result of independent service contracts." (Emphasis *sic*.) *Id.* at 195. There was no dissent to that language and all the judges deciding that case are likewise deciding today's case. Now, less than six months later, that laudable language and decision are being sacrificed on the altar of "economy."

In *Local 4501* v. *Ohio State Univ., supra* (24 Ohio St. 3d), this court went on to suggest that the provisions of R.C. 4117.01 *et seq.,* Ohio's Public Employees Collective Bargaining Act, provided an adequate check on the letting of independent contracts for civil service positions. We stated:

"A public employer's practice of letting out independent service contracts, rather than filling *vacant* civil service positions with employees who would perform the same work as the independent contractors, is a matter that pertains to 'wages, hours, or terms and other conditions of employment' and, as such, is a proper subject of collective bargaining between the

---

[3] It should be noted that the holdings of neither *Local 4501* v. *Ohio State Univ.* (1984), 12 Ohio St. 3d 274, nor *Local 4501* v. *Ohio State Univ.* (1986), 24 Ohio St. 3d 191, *even* apply to the case now before us. In those cases the issue was the non-filling of vacant positions. Here we are dealing with abolishment of jobs, which procedure is specifically regulated by statute.

public employer and the exclusive representative of an affected bargaining unit." (Emphasis added.) *Id.*

In the case *sub judice*, the majority, in a footnote, states that its decision "* * * does not adversely affect the right of civil servants to protect their positions at the bargaining table under their statutory right to collectively bargain with their employers over 'matters pertaining to wages, hours, or terms and other conditions of employment.' " I disagree. Indeed, under the majority's interpretation of R.C. 124.321(D), which allows the abolishment of positions, without meeting the requirements of the statute, the check of collective bargaining over the independent contractor issue is wholly eradicated. When positions are abolished, civil service employees are absolutely foreclosed from protecting their interests at the bargaining table; they cannot bargain for a position that no longer exists.

While I certainly do not mean to suggest that appellees' positions were eliminated for any but the most altruistic reasons, the potential for abuse somewhere in the future is staggering. In its most raw and abusive form of excess, an appointing authority, seeking to abolish any or *all* of the jobs falling within its jurisdiction, would need only demonstrate that the hiring of independent contractors would result in some measure of economy to the operation of the appointing authority's organization. Through such a systematic reduction of the civil service work force, the civil service laws would be inexorably rendered meaningless. The appointing authority, under the guise of economizing through the hiring of independent contractors, is free to rid an organization of employees deemed "undesirable" because of political philosophy, race, gender or union activity.

In addition to the abuses hereinbefore delineated, the "abolishment" of civil service jobs that are to then be filled by independent contractors gives rise to other, more perilous consequences. While saving some $140,000 in a single year, apparently as is the case here, appears desirable in the short run, in the long run the practice may prove unacceptably expensive, both in terms of cash and services. Positions filled by uniquely qualified civil servants may be lost to independent contractors. When an appointing authority, whether it is a city, county or the state, has abandoned its entire capacity to provide a service with civil servant employees, the private contractor is unrestrained in the demands he may make on the appointing authority. For example, a city may choose to "abolish" its refuse collection department and contract out those services. When the city has laid off its refuse employees, sold its garbage trucks and landfill, its capacity to serve its citizenry is severely, and perhaps dangerously, limited. It is the contractor who then owns the trucks, hires the employees, and operates the landfill. What option is available when the price of the service is doubled or tripled by the contractor when the contract is renegotiated?

This scenario, now in its incipient stages with the consideration of this case, is the type of result which civil service laws, including R.C.

124.321(D), were designed to prevent. By limiting an appointing authority from "abolishing" a job that, in actuality, still exists, both the citizens of this state and its civil service employees are better protected from the dangers of the abuse of power. I find that R.C. 124.321(D), when carefully considered and applied, is capable of providing, and in fact was designed to afford, this protection.

Writing for a unanimous court of appeals below, Judge John W. McCormac, with Judges Alan E. Norris and J. Thomas Guernsey, concurring, said:

"There was no permanent deletion of positions due to a lack of continued need for the position. The positions were still needed and the work was still to be done. Job abolishment means a permanent elimination of a particular position. *In re Appeal of Moreo* (1983), 13 Ohio App. 3d 22. Here, the positions remain and it was appellants who were effectively terminated from those positions. R.C. 124.321(D) does not allow a certified civil service employee to be laid off from a position while leaving that position intact for another person to fill, whether that person is another public employee or an employee of a private concern."

There can be no improvement on the eloquence of Judge McCormac.

Accordingly, because I would affirm the judgment of the court of appeals, I dissent.

C. BROWN, J., concurs in the foregoing dissenting opinion.

CLIFFORD F. BROWN, J., dissenting. I join in the well-reasoned dissent of Justice Douglas which reveals that the Ohio Department of Health unlawfully abolished the plaintiffs' civil service positions in its Division of Data Services contrary to R.C. 124.321(D).

I caution the bench and bar not to accept the majority opinion as sound law or as reflecting the actual views of all four justices who concurred in the *per curiam* opinion. It therefore should be disregarded as legal precedent. At the official court conference on December 19, 1986, when the *per curiam* opinion filed in this case was considered by the court for approval, Justices Locher, Holmes and Wright voted "yes" to approve the *per curiam* opinion, but Chief Justice Celebrezze and Justice Sweeney voted "no," as did Justices Douglas and Brown. Thus, the *per curiam* opinion failed to obtain a majority of four and thus failed to be adopted as the opinion and judgment of the court. Chief Justice Celebrezze and Justice Sweeney at that time stated their desire to join Justices Douglas and Brown, and thereby to make a new majority of four holding the plaintiffs' job abolition unlawful. Later that day Chief Justice Celebrezze presented a *per curiam* opinion containing the Douglas analysis and judgment that the job abolition was unlawful. However, on the new *per curiam* opinion authored by Chief Justice Celebrezze, which reflected the views of Justices Douglas, Brown and Sweeney, Justice Douglas again voted "no," with

Chief Justice Celebrezze and Justices Sweeney and Brown voting "yes." This new *per curiam* opinion by Chief Justice Celebrezze had only three votes for approval and thus failed to have the necessary majority of four for adoption as the opinion of the court.

The two new opinions, each reflecting opposite views from the other, failed to obtain the approval of Justice Douglas and thereby failed to be adopted by the court because each obtained only three votes for approval rather than the necessary votes of the majority of four. The impasse caused by the obstructionist maneuver of Justice Douglas would have caused this case to be undecided by the court in 1986 and would have caused it to be held over for reargument by the newly composed court in 1987.

To avoid this unnecessary judicial horseplay, Chief Justice Celebrezze reverted to his original conference position of several weeks earlier, joining Justices Wright, Holmes and Locher, to constitute a majority of four approving the *per curiam* opinion on file in this case which holds the abolition of plaintiffs' jobs lawful.